**CHATLOS SYSTEMS, INC., a New Jersey Corporation, Plaintiff,**

v.

**NATIONAL CASH REGISTER CORPORATION, Defendant.**

Civ. A. No. 77-2548.

United States District Court,
D. New Jersey.

Oct. 22, 1979.

As Amended Nov. 14, 1979.

Marc S. Friedman, Barrett F. Kalb, Kalb, Friedman & Siegelbaum, Newark, N. J., for plaintiff.

Richard V. Jones, Stryker, Tams & Dill, Newark, N. J., for defendant.

## OPINION

WHIPPLE, Senior District Judge.

This case was tried before the Court sitting without a jury during May and June of 1979. The action arises out of the sale, through a leasing arrangement, of computer hardware and software. The plaintiff alleges breach of contract, breach of express and implied warranties, fraudulent misrepresentation, and seeks compensatory and punitive damages.[1] The parties

---

1. Though not raised in the pleadings, in post-trial memoranda plaintiff has asserted two additional theories of liability. "Computer mal-practice" and strict liability in tort are alleged to have been proven at trial.

have submitted extensive trial memoranda and proposed findings and conclusions. After careful consideration of all testimony, exhibits admitted into evidence, oral argument, and trial memoranda, the Court hereby adopts the following findings of fact and conclusions of fact pursuant to Fed.R.Civ. Pro. 52.

The plaintiff, Chatlos Systems, Inc. (hereinafter CSI) is a New Jersey corporation engaged in the design and manufacture of cable pressurization equipment for the telecommunications industry. Edward Chatlos is the president of CSI. The defendant, NCR Corporation (hereinafter NCR) previously known as National Cash Register Corporation, is a Maryland corporation having its principal place of business in Dayton, Ohio. NCR designs, manufactures and sells computer systems, programming and services.

The action was originally filed in the New Jersey Superior Court. It was removed on motion of the defendant citing diversity of citizenship and an amount in controversy exceeding $10,000.00.

In the spring of 1974 the plaintiff became interested in purchasing a computer system in order to modernize the control of data which had become increasingly difficult since the incorporation of CSI in 1967. Mr. Chatlos made inquiries of several computer companies and was visited by Sam Long, a NCR salesman. After discussions wherein NCR was apprised of CSI's detailed business history and operations, Mr. Long recommended that CSI acquire a computer known as the NCR 399 Magnetic Ledger Card System (330 MAG).

It was represented that the 399 MAG would provide six functions for CSI through the use of computer programs. The six functions were Accounts Receivable, Payroll, Order Entry, Inventory Deletion, State Income Tax, and Cash Receipts.

On July 11, 1974 Mr. Chatlos in his capacity as chief executive of CSI signed a System Services Agreement for the sale of a 399 MAG. Shortly thereafter he had discussions with a representative of Burroughs Corporation, a major competitor of NCR. In these discussions Mr. Chatlos learned of a more advanced method of storing data than magnetic ledger cards which was known as a disc system. When he brought this information to the attention of Mr. Long, he was told that NCR also sold a disc system which could be utilized with the basic 399 unit. The computer was called the 399/656 Disc System.

It was represented by NCR that the 399/656 Disc would perform the same functions as the 399 MAG. It was further represented that the more advanced system was a good investment for CSI's present and future needs, that it would solve inventory problems, would result in direct savings of labor costs, would be programmed by capable NCR personnel, and would be "up and running"[2] within six months.

In reliance upon these representations CSI entered into the transaction. On July 24, 1974 CSI entered into a System Services Agreement with NCR as part of the transaction. CSI paid $5,621.22 under this agreement. (P. 30d, 30e, D–81, D–82). Because both NCR and an independent leasing company disapproved CSI's credit, on February 4, 1975 CSI entered into a leasing arrangement with the Midlantic National Bank whereby CSI agreed to pay $70,162.09 in sixty-six equal payments. (P. Ex. 21). This is a common practice in the trade; the computer company sells the system to a

The novel concept of a new tort called "computer malpractice" is premised upon a theory of elevated responsibility on the part of those who render computer sales and service. Plaintiff equates the sale and servicing of computer systems with established theories of professional malpractice. Simply because an activity is technically complex and important to the business community does not mean that greater potential liability must attach. In the absence of sound precedential authority, the Court declines the invitation to create a new tort. In view of the findings and conclusions, *infra* the Court deems it unnecessary to rule explicitly on plaintiff's assertion of strict liability in tort.

2. "Up and running" is a trade term which means that the system is fully performing the functions for which it is intended.

bank who in turn leases it to the "purchaser."

On December 11, 1974 the computer hardware was delivered to CSI. At this point Mr. Chatlos, on behalf of CSI, understood that it would take slightly longer, that is three months from the date of delivery, to have the system "up and running." Based upon the representations of NCR, CSI expected the machine to be fully operational by March 1975.

After the hardware was delivered, Frank Hicks, an experienced NCR programmer began learning the CSI payroll program. Though experienced in the 399 unit, Mr. Hicks had not attended the Disc school. He arrived at CSI in January 1975 and attempted to program and install the 399/656 Disc until February 1976. The payroll program became operational in March 1975, yet the State Income Tax programs were not successfully installed until September 1, 1976.

After programming the payroll function Mr. Hicks attempted to install the inventory deletion and order entry programs which involved the use of a procedure known as multiple records per sector. Placing multiple records in a sector means that several pieces of data or information are stored in one sector or section of the disc. Mr. Hicks had problems with the process in that he could not delete one piece of information within the same sector. CSI's business involves the assembly of technical equipment using many component parts. If the information contained in a sector was the existence of several specific parts in inventory, when one part was deleted (because it had been used in the assembly of equipment), the existence of the other parts was also deleted. Thus the functions of inventory deletion and order entry were inoperative.

On January 1, 1976 Richard Moody, Branch Service Manager of NCR's Newark District Office became responsible for the CSI installation. In February 1976 Mr. Moody assigned Pasquale Turi and Edward Tuosto to replace Mr. Hicks at the CSI site. Assurances were given to CSI that the computer would soon be demonstrated. On March 9 and 10, 1976 several NCR system analysts attempted to demonstrate the order entry and accounts receivable functions. This demonstration revealed significant problems with both functions.

On June 7, 1976 CSI asked that the lease be cancelled and the computer removed. NCR asked for additional time to make the 399/656 Disc fully operational and CSI agreed.

In July and August 1976 several meetings took place between NCR and CSI. Two other NCR analysts, Doug Russo and Bob Zebroski began another attempt to program the computer. On August 31, 1976 CSI experienced problems with the payroll function, the only job the computer had been performing. On that same day Mr. Tuosto installed the State Income Tax programs and on September 1, 1976 the problems with it were corrected.

On September 2, 1976 Mr. Moody arrived at CSI and announced that he was ready to install the order entry program. CSI refused. On September 3, 1976 Mr. Chatlos sent a letter to NCR describing the events of that summer and asked to cancel the lease and have the computer removed from the CSI premises. NCR refused stating that it had no ownership rights in the 399/656 Disc because it had been paid by the Midlantic Bank in August 1975.

Though Mr. Hicks worked on the programming problems for over one year, and other NCR personnel attempted to correct them, the 399/656 Disc only performed the payroll function and never performed the other four functions. Moreover, Mr. Chatlos and the other personnel of CSI gave full cooperation to NCR up until September 2, 1976.

This transaction was for the "sale of goods" notwithstanding the incidental service aspects and the lease arrangement; therefore Article 2 of the Uniform Commercial Code, as adopted by the State of New Jersey, is the applicable law. N.J.S.A. 12A:2–101 *et. seq.*, *see, Atlas Industries, Inc. v. National Cash Register*, 216 Kan. 213, 531 P.2d 41 (1975); *Acme Pump Com-*

*pany, Inc. v. National Cash Register,* 32 Conn.Sup. 69, 337 A.2d 672 (C.C.P. 1974). Because of this application and the following conclusions it is unnecessary to consider the common law breach of contract claim.

### WARRANTY

Under N.J.S.A. 12A:2–313(1)(a) and (b) express warranties are created by a seller as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

.    .    .    .    .

Express written warranties were made by NCR in the Equipment Order and Sales Contract where it specifically stated that NCR warranted the described equipment for "12 months after delivery against defects in material, workmanship and operational failure from ordinary use." Furthermore the July 24, 1976 System Services Agreement specifically states, "NCR warrants that the services will be performed in a skillful and workmanlike manner." Though for services, this was part and parcel of the entire transaction for a sale of goods.

Together with the written warranties, Mr. Long, the NCR salesman, made verbal warranties as outlined in the facts. All of these warranties were memorialized in the Purchase Order prepared by the Midlantic National Bank where it is written at paragraph 6:

Since the above goods [the 399/656 Disc] are purchased by us expressly for the use of the lessee, [CSI] you [NCR] further warrant that the goods are in good working order, fit for the use for which the Lessee intends them, fulfill all representations made by you to Lessee, . . . (Plaintiff's ex. 36).

Since the written and verbal representations were obviously a basis of the bargain, it is clear that NCR created express warranties.

Under N.J.S.A. 12A:2–315 an implied warranty of fitness for a particular purpose is created:

Where a seller at the time of contracting has reason to know of any particular purpose for which the goods are required and has reason to know that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose.

NCR states in their trial brief that language in the Equipment Order and Sales Contract and the Systems Services Agreement effectively disclaimed all implied warranties. This argument merits little discussion because in the pre-trial order, by stipulation, NCR agreed they had represented the 399/656 Disc would perform the six functions and that NCR would provide the requisite know-how necessary to put the system into operation. While those stipulations all but admit express warranties, NCR also agreed it had expertise in the computer field and that it recommended the 399/656 Disc for the plaintiff's "express purpose." Furthermore, NCR was well aware that CSI was relying upon NCR's skill and judgment. Nothing was presented at trial to contradict the conclusion that under N.J.S.A. 12A:2–315 there was an implied warranty of fitness for the particular purposes of CSI.

Moreover, CSI having met their burden of proof and based upon the facts outlined, it is clear that NCR breached both express warranties and the implied warranty of fitness.[3] It is unnecessary to outline each breach because the statutory remedies provided in N.J.S.A. 12A:2–714 become applicable after any breach of warranty is established.

---

**3.** Because it is concluded that NCR breached express warranties and the implied warranty of fitness for a particular purpose, it is unneces-

sary to discuss and rule upon whether there existed an implied warranty of merchantability and if so, whether it was breached.

## REMEDY FOR BREACH OF WARRANTY

Having concluded that NCR breached express and implied warranties, plaintiff is entitled to the remedies as provided in the Uniform Commercial Code as follows:

(1) * * *

(2) The measure of damages for breach of warranty is the difference . . . between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case incidental and consequential damages under the next section [2–715] may also be recovered.

N.J.S.A. 12A:2–714 captioned "Buyer's Damages for Breach in Regard to Accepted Goods." [4]

The Court does not lightly view the admonition of N.J.S.A. 12A:1–106(1) which states that:

[t]he remedies provided by this Act shall be liberally administered to the end that *the aggrieved party may be put in as good a position as if the other party had fully performed* but neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law. (emphasis supplied)

A two-step process is necessary in order to fully consider the initial question of damages herein. The first inquiry must be to determine the value of the goods if they had been as warranted. This is not the "market value" since that term is conspicuously absent from § 2–714(2). The appropriate starting place is the $70,162.09 the plaintiff indebted itself to pay the bank for the computer system. It includes the amount the defendant received, the sales tax, together with the interest charges under the lease arrangement.[5] The $5,621.22 paid by the plaintiff for the service contract is added because it was an inseparable element of the entire transaction. The Court finds the total value of the computer system if it had been as warranted to be $75,783.31.

The value of what was accepted must be deducted from the $75,783.31. Plaintiff's expert testified that the value of the hardware presently located at CSI is between $5,000.00 and $7,000.00. Taking the average, the Court finds the present value to be $6,000.00. An additional element must be calculated; the value of the payroll function which plaintiff admits was used from March 1975 until October 1976. Since neither plaintiff nor defendant presented any evidence of this value, the Court will assign a value as follows. The payroll function was one of the six that

---

4. CSI attempted to revoke their acceptance by requesting the removal of the computer system in their letters of June 7, 1976 and September 3, 1976. As stated in NCR's responding letter of September 10, 1976:

. . . the equipment was purchased by your bank who in turn leased it to Chatlos Systems, Inc. Since this was a purchase, NCR has no ownership rights to the equipment and therefore, I cannot have it removed from your premises.
(Defendant's ex. 27)

Because NCR's response was essentially correct, CSI was unable to revoke their acceptance. Thus CSI cannot invoke the remedies of N.J.S.A. 12A:2–712 and 12A:2–713. *See* White and Summers, *Text on The Uniform Commercial Code* (1972) § 10–1, at 306. The appropriate remedy is N.J.S.A. 12A:2–714, the remedy for breach in regard to accepted goods.

5. The total amount of interest charges are included for two reasons. First, any purchaser using credit would have had to pay similar charges to receive the computer system. Secondly, if the interest charges were not included here, they would be proper as consequential damages. As stated in a similar computer case within the Third Circuit:

"[A]t the time of contracting (the defendant) had reason to know" that plaintiff would borrow money to purchase this capital item, thereby establishing the interest charge as an item of consequential damage under § 2–715. *Carl Beasley Ford Inc. v. Burroughs Corp.*, 361 F.Supp. 325, 334 (E.D.Pa. 1973), *aff'd without opinion*, 493 F.2d 1400 (3d Cir. 1974). *See also, Diversified Environments v. Olivetti Corp.*, 461 F.Supp. 286, 292 (M.D.Pa. 1978). The holding in *Carl Beasley Ford, supra* has even greater weight when applied to the facts herein. When NCR refused to extend credit to CSI, plaintiff was forced to seek the lease arrangement.

were promised, therefore, it is reasonable to recognize this benefit as one-sixth of the value if as warranted, or one-sixth of $75,-783.31. This equals $12,630.55. The sum of the two adjustments is $18,630.55. When this figure is deducted from $75,783.31 the $57,152.58 result is the amount to which plaintiff is entitled as the direct measure of damages for breach of warranty, before discussion of incidental and/or consequential damages.

■ NCR maintains that an effective limitation on recovery of consequential damages appears in the System Services Agreement. The written warranties previously discussed conclude that "NCR's obligation is limited to correcting any error in any program as appears within 60 days after such has been furnished." (Plaintiff's ex. 30–c, 30–d; Def. 81, 82) Later language in the System Services Agreement states, "in no event shall NCR be liable for special or consequential damages from any cause whatsoever." These phrases clearly attempt to limit the purchaser's remedy to having any error corrected within sixty days after the appropriate programs are furnished. Since four of the six functions were never furnished, the attempted limitation falls squarely within N.J.S.A. 12A:2–719(2) which provides that:

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

Uniform Commercial Code Comment 1 following N.J.S.A. 12A:2–719 states:

> [I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequences that there must be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause

had never existed. Similarly, *under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provision in this Article.* (emphasis supplied)

This reasoning has been adopted by several courts. In *Beal v. General Motors,* 354 F.Supp. 423 (D.Del.1973) a motion to strike allegations of consequential damages was denied, despite an apparently valid exclusive remedy clause. There the district court noted that:

> [t]he purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of an express warranty, is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the point of view of the buyer *the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered. When the warrantor fails to correct the defect as promised within a reasonable time he is liable for a breach of that warranty.* . . . *The limited, exclusive remedy fails of its purpose and is thus avoided under § 2–719(2), whenever the warrantor fails to correct the defect within a reasonable period.* (citations omitted) (emphasis added)

354 F.Supp. at 426. *See also, Riley v. Ford Motor Company,* 442 F.2d 670 (5th Cir. 1971); *Koehring Company v. A.P.I. Inc.,* 369 F.Supp. 882 (E.D.Mich.1974).

Because NCR never furnished four of the six promised functions, their attempted limitation of remedy failed of its essential purpose. CSI was thereby deprived of the substantial value of its bargain. For these reasons NCR is liable for consequential and incidental damages as provided for in N.J. S.A. 12A:2–714(3) and defined in N.J.S.A. 12A:2–715.

Though not arising out of the contract, a major limitation does exist on plaintiff's claim for consequential damages. When CSI refused to accept Mr. Moody's offer of September 2, 1976, CSI's claim for consequential damages terminated. Initially CSI asked that the computer system be removed by letter of June 7, 1976 (Plaintiff's ex. 12–e). When NCR asked for additional time to make all functions operable, CSI granted them more time. Here CSI was acting in a commercially reasonable manner. During the summer of 1976 NCR was making a renewed effort. New people had been brought in. CSI's own memo of events (Plaintiff's ex. 41) shows that by September 1, 1976 the State Income Tax program was installed and operational. When Mr. Moody offered to continue the installation CSI should have accepted.

▋ N.J.S.A. 12A:2–715(2)(a) limits the recovery of consequential damages to situations where they "could not reasonably be prevented by cover [6] or *otherwise*." (emphasis supplied) CSI was not in a position to "cover" by spending large sums of money for a replacement computer system. Until September 2, 1976 they were relying upon NCR to supply it. However, they could have prevented many of their consequential damages "otherwise", that is by continuing their cooperation. In *Fablok Mills Inc. v. Cocker Machine & Foundry Corp.*, 120 N.J. Super. 350, 294 A.2d 62 *rev'd on other grounds*, 125 N.J.Super. 251, 310 A.2d 491 (App.Div.1973) it was stated that:

> In certain situations continued use of [the] goods by the buyer may be the·most appropriate means of achieving mitigation, i. e., where the buyer is unable to purchase a suitable substitute for the goods.

125 N.J.Super. at 257–258, 310 A.2d at 494. This was precisely the situation CSI faced. Because they could not reasonably be ex-

pected to replace the system in September of 1976, they should have continued their cooperation by accepting the installation of the other programs.[7]

A time limitation on damages was imposed in *Clements Auto Company v. Service Bureau Corp.*, 444 F.2d 169 (8th Cir. 1971). *Clements* involved a similar factual situation where the district court concluded that fraudulent misrepresentations were made and awarded substantial damages. On appeal the United States Court of Appeals for the Eighth Circuit limited the damages awarded to the time period in which the plaintiff was justified in relying upon the misrepresentations. That is not the situation at bar, however, *Clements* has been relied upon by CSI in support of their various damage claims, while CSI has ignored the time limitation. *Clements* demonstrates that commercially reasonable standards can create a limited time period during which the damages are recoverable. For purposes of this case, all recoverable elements of consequential and incidental damages will be determined from March 1975 (when the system was promised) until September 1976 (when CSI ceased their cooperation), a total of eighteen months when NCR was liable for breach of warranties.

Incidental and consequential damages are defined as follows:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and *care and custody of goods* rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and *any other reasonable expense incident to the delay or other breach.*

(2) Consequential damages resulting from the seller's breach include:

---

6. "Cover" is the term used in the Uniform Commercial Code to describe the purchase of replacement goods by a buyer where the original goods received do not conform to the contract.

7. The Uniform Commercial Code Comment 2 following N.J.S.A. 12A:2–715(2)(a) further de-

scribes the purpose of subparagraph 2 in that it:

> carries forward . . . prior uniform statutory provisions as to consequential damages [for] breach of warranty, but *modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise.* (emphasis supplied)

(a) *any* loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know  .  .  .  .

(b) .  .  .

(emphasis supplied) N.J.S.A. 12A:2–715(1) and (2).[8]

■ The plaintiff has offered exhibits and testimony to substantiate their claim for these damages. The first loss to be considered is what plaintiff calls increased labor cost for accounting, inventory, sales, and executive salaries. These costs largely occurred after September 1976 and are disallowed with an important exception. Having found NCR expressly warranted that CSI would save labor costs by implementation of the 399/656 Disc, and that warranty having been breached, it is necessary to compensate plaintiff for the consequential costs.

It was estimated that by implementation of the NCR computer system, CSI would save the cost of two employees whose services would no longer have been needed. NCR knew this was a major reason CSI entered the transaction. The United States Supreme Court has determined that:

Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate  .  .  .

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1926). From the proofs it appears the cost for each employee of this type was $15,000 annually. Therefore plaintiff is entitled to the cost (for eighteen months) for each of the employees receiving $15,000 per year, a total of $45,000.

■ Plaintiff also seeks damages for executive salaries for the time devoted to working with NCR. These are reasonable with the exception of the time spent by Mr. Chatlos. As Chief Executive Officer he assumed the risk of all corporate problems

and is not entitled to reimbursement of compensation by NCR. The expenses for the Plant Operations Manager (12% of salary for twenty-six weeks or $2620.00) and the Chief Bookkeeper (30% of salary for the eighteen month period or $5,107.20) are reasonable. Plaintiff is therefore awarded $7,727.20. *See, Clements Auto Company v. Services Bureau Corp., supra.*

■ Plaintiff also seeks losses in profits for excesses and deficiencies in inventory. These were a consequence of the failure of the inventory deletion and order entry functions to operate. This was another major reason CSI entered into the transaction. Plaintiff presented evidence (plaintiff's ex. 52) and testimony to show lost profits because of excess inventory in 1975 totalling $5,080.95. Similarly for 1976 CSI showed a deficiency in inventory causing a profit loss of $3,325.24. When adjusted to include only the eighteen-month period these figures are reduced to $4,234.13 for 1975 and $2,216.83 for 1976, a total of $6,450.96. CSI paid $1,750.00 for a manual inventory system which could not perform the functions as well as a computer system. Plaintiff is entitled to the $1,750.00 in addition to $6,450.96 for profit losses.

■ CSI will receive the cost of various supplies purchased in an attempt to make the computer function. Evidence disclosed this amount to be $1,433.00. Moreover, plaintiff is entitled to the cost of the space occupied by the machine. Testimony revealed a formula for the annual rental; the cost per square foot multiplied by the measured size of the computer. After adjusting the figure to include only the eighteen months, plaintiff is entitled to $1,197.00.

■ Plaintiff's requests for the value of the space occupied by Mr. Hicks, cost of the powerline, and for maintenance of the area where the computer was kept, are denied. Mr. Hicks was trying to make it operate, the powerline was needed for the payroll function to be performed, and maintenance

**8.** New Jersey Study Comment 2 following N.J.S.A. 12A:2–715 notes that in New Jersey consequential and incidental damages have traditionally been called "special damages." More recent New Jersey cases appear to follow the UCC terminology.

would have been done whether the machine worked or not.

## FRAUDULENT MISREPRESENTATION

Plaintiff alleged and attempted to prove at trial that NCR made fraudulent misrepresentations in this transaction.[9] It is necessary to consult the common law of New Jersey for consideration of this claim. In *Thomas v. Duralite Company*, 386 F.Supp. 698 (D.N.J.1974), *aff'd in part, rev'd in part on other grounds and vacated*, 524 F.2d 577 (3d Cir. 1974) it was stated that:

The term fraud is used in New Jersey to designate what is really an action for deceit. *Anderson v. Modica*, 4 N.J. 383, 389, 73 A.2d 49 (1950). There are five necessary elements to maintain an action for deceit in New Jersey:

(1) a representation by defendant to the plaintiff with intent that the latter party rely upon it;

(2) knowledge on the part of the defendant that the representation is in fact false;

(3) belief by the plaintiff that the representation is true;

(4) reliance on such representation; and

(5) the taking of action and consequent injury. (citations omitted)

386 F.Supp. at 718.

█ Plaintiff attempted to prove that NCR knew the representations they made were false. It was plaintiff's position that NCR knew CSI was an experimental site and wrongfully withheld this information. Plaintiff correctly asserts that under New Jersey law, an affirmative representation is not required to prove fraud. *Weintraub v. Krobatsch*, 64 N.J. 445, 317 A.2d 68 (1974). However, NCR admits CSI was a control

site. No evidence was presented to show plaintiff was unaware of this fact.

Plaintiff's own expert testified that 40% of all computer installations fail. It is not unreasonable to view all such installations as somewhat of an experiment. When remembered that CSI itself was engaged in a highly technical business, clearly NCR's representations were not directed to an unsophisticated consumer. One issue at trial was the degree of development of other 399 disc systems at the time of this contract. The plaintiff failed to show the other systems were not operating.[10] Plaintiff did not prove NCR fraudulently represented the state of affairs at the time.

NCR did represent the 399/656 Disc would work and essentially it did not. Plaintiff alleges that NCR knew it would not work and were simply seeking a competitive advantage by installation at CSI. Among the NCR inter-company documents that plaintiff successfully had admitted into evidence was a memo captioned "399 Disc Control Site Selection Guidelines" (Plaintiff's ex. 9). It contains statements relating to the competitive benefits NCR would enjoy with, "(a) *good* NCR disc installation in this area . . . " (emphasis supplied). This pertained to the CSI site and while it does show NCR was concerned about competitive aspects, it also shows that NCR fully intended the installation to be successful.

█ NCR made promises they hoped would be fulfilled in the future. However, under New Jersey case law:

Statements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute

---

**9.** *See generally, Triangle Underwriters Inc. v. Honeywell, Inc.*, 457 F.Supp. 765 (E.D.N.Y. 1978), *aff'd in part, rev'd in part*, 604 F.2d 737 (2d Cir. No. 79–7532, decided July 17, 1979) where fraud allegations were made in a similar factual situation. The district court dismissed the allegations of fraud as "simply restatements of the breach of contract claims." The Second Circuit partially reversed holding that the allegation of fraud in the inducement was

extraneous to the contract, while the dismissal of the other fraud claims was affirmed. *Triangle, supra*, however, involved extensive reliance on the substantive laws of New York.

**10.** Plaintiff's ex. 25 and ex. 45 list numerous 399 Disc Sites in various parts of the country. Even if similar problems were encountered, all of the listed dates for delivery are prior to March 1975.

misrepresentations even though they turn out to be false, at least where they are not made with intent to deceive, and where the parties have equal means of knowledge, [citations omitted] or the subject is equally open to the investigation of both, and an examination has not been fraudulently prevented.

*Middlesex County Sewer Authority v. Borough of Middlesex,* 74 N.J.Super. 591, 605, 181 A.2d 818, 826, *aff'd* 79 N.J.Super. 24, 190 A.2d 205 (App.Div.1962). Any intent to deceive by NCR is negated by the presence of various NCR employees at CSI throughout. During that time period both parties shared the same intent; to get the system "up and running" as soon as possible. In this way plaintiff would have been satisfied and defendant would have attained their goal of a "good" installation. Had NCR abandoned the project, plaintiff's allegation of fraud may have been sustained, however, after consideration of all testimony and evidence it is concluded that NCR's representations were overly optimistic, not fraudulent.

■ Because of alleged fraudulent misrepresentation and other theories of liability plaintiff seeks punitive damages. In New Jersey, punitive damages are awarded in the sound discretion of the trier of fact:

> upon a theory of punishment . . . [after taking] into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of the harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of damages.

*Leimgruber v. Claridge Associates Ltd.,* 73 N.J. 450, 456, 375 A.2d 652, 654–655 (1977). Moreover, as indicated by the language in *Leimgruber* above:

> Punitive or exemplary damages have traditionally been reserved for civil wrongs characterized as torts.
>
> \*     \*     \*     \*     \*     \*
>
> In the absence of exceptional circumstances dictated by the nature of the relationship between the parties or the

duty imposed upon the wrongdoer, the concept of punitive damages has not been permitted in litigation involving breach of a commercial contract.

*Sandler v. Lawn-A-Mat Chem. & Equip. Corp.,* 141 N.J.Super. 437, 448–449, 358 A.2d 805, 811 (App.Div.1976).

■ Since no tort liability has been imposed and in view of the fact that NCR had an employee or employees at CSI for the entire time, the Court fails to find evidence of wrongful intent. Furthermore, in the absence of the plaintiff having established any exceptional circumstances, no basis exists to justify an award of punitive damages.

In conclusion, judgment will be entered for the plaintiff awarding compensatory damages alone in the amount of $120,-710.92, as outlined in this opinion and restated in the following chart.

COMPENSATORY DAMAGES

1. For Direct Breach of Warranties:

   a. Value of goods if they had been as warranted:

   | | | |
   |---|---|---|
   | CSI indebtedness | $70,162.09 | |
   | Service Contract | $ 5,621.22 | |
   | | | $75,783.31 |

   b. Value of goods accepted:

   | | | |
   |---|---|---|
   | Hardware | $ 6,000.00 | |
   | Payroll Program | 12,630.55 | |
   | | | −$18,630.55 |
   | Sub Total | | $57,152.76 |

2. Consequential Damages:

   | | |
   |---|---|
   | a. employee losses | $45,000.00 |
   | b. executive losses | $ 7,727.20 |
   | c. profit losses | $ 6,450.96 |
   | d. manual system cost | $ 1,750.00 |
   | e. supplies | $ 1,433.00 |
   | f. rental space | $ 1,197.00 |
   | | $63,558.16 |

3. Punitive Damages: $ 0.00

   | | |
   |---|---|
   | Total Damages | $120,710.92 |

Counsel for plaintiff shall submit an appropriate order within five (5) days.