**NAPASCO INTERNATIONAL, INC., Plaintiff,**

v.

**TYMSHARE, INC., Defendant.**

**Civ. A. No. 81–2285.**

United States District Court, E.D. Louisiana.

Feb. 8, 1983.

**15.** As discussed above, these state claims have  been dismissed against the other defendants.

Frank J. Uddo, New Orleans, La., for plaintiff.

Carey J. Guglielmo, Judith Atkinson Chevalier, Baton Rouge, La., for defendant.

CASSIBRY, District Judge:

## OPINION

This case was heard before the Court sitting without a jury in November of 1982. The action arises out of an attempted installation of an on-line computer system. The plaintiff alleges breach of contract, states that the breach was in bad faith, and seeks compensatory damages. The jurisdiction of this Court rests on diversity of citizenship and is uncontested.

## FINDINGS OF FACT

### I.

The plaintiff, Napasco International, Inc. ("Napasco"), is a Louisiana corporation engaged in the manufacturing and distribution of a number of chemical products. The defendant, Tymshare, Inc. ("Tymshare"), a California corporation, is, to quote from its sales proposal to Napasco, "the world's largest independent remote computer services company." That is, Tymshare primarily deals with companies interested in setting up "on-line" systems, in which the companies do not actually have their own computers "in-house"; its wares are, by and large, software.

## II.

In early 1980, Napasco was a company with a problem: information. The company's procedure for taking stock of its inventory was time-consuming, its accounting methods inadequate. As a result of these related problems of timeliness and accuracy, Napasco had been consistently over-buying amounts of goods. To end its wasteful overbuying, Napasco contracted with Alexander Grant and Company, an accounting firm, to set up a perpetual inventory control system, one designed to gain "numerical control" over the company's various raw materials and finished goods and to determine if the quantities on hand were proper.

Napasco soon realized, however, that it needed a computer system if the company was to get a handle on its inventory. In addition, by June of 1980, Napasco was seeking to obtain financing from Citicorp Industrial Credit, Inc. ("Citicorp") and one of the prerequisites to such financing was that Napasco provide Citicorp with regular, i.e. timely, financial statements—a task which, under Napasco's manual system, it could not perform. Consequently, with the agreement of Alexander Grant, Napasco contacted Tymshare.

## III.

After speaking with a representative of Tymshare from New Orleans, Don Champagne, who was Napasco's controller during this transaction, ultimately contacted Tymshare's Houston office, which offered a computer system named "MANUFACTS." In July of 1980, Tymshare gave a presentation of the MANUFACTS system at Napasco's office. MANUFACTS was represented to be a complete computer accounting system for a manufacturing concern; one important element of the system was its "integrated" characteristic, meaning that information would flow between modules without the need for separate entry of the same data into each module.

Following the presentation, two Tymshare representatives returned to Napasco's office in New Orleans and conducted a survey in late July. The purpose of the survey, which lasted two or three days, was for Tymshare to become acquainted with Napasco's operation generally in order to prepare a proposal. During the survey, Tymshare was made aware of Napasco's needs and problems with respect to inventory, and of Citicorp's informational demands on Napasco.

## IV.

On August 6, 1980, Tymshare presented Napasco with a document entitled "A Proposal to Napasco International, Inc." This impressive document, after extolling the virtues and qualifications of Tymshare, made clear Tymshare's "Software Philosophy":

> . . . to place in [the customer's] hands powerful tools to enable [it] to bring a system on-line quickly, and to allow [it] to make alterations with ease and convenience as [its] needs change. The software tools we provide are designed to allow non-computer professionals comfortable interaction with their data . . .

More particularly, the Proposal represented that MANUFACTS' "modular approach" would allow Tymshare

> to tailor the system to NAPASCO's requirements. By using only the modules relevant to your needs, Tymshare can customize the operations and streamline the system. MANUFACTS uses your forms and fits your reporting formats . . . The reports are available, complete, current, and tailored to each department's specifications.

Finally, the Proposal offered its "Statement of the Problem." Recognizing that Napasco was then using a wholly manual system and that the company needed "an organized and timely flow of relevant data," Tymshare went on in detail:

> The system must address the following functional specifications: a current-value method of inventory valuation; the storage and comparison of historical accounting data; provide an immediate and complete access to the user; offer custom tailoring of the system as company re-

quirements change; mass change on the Bill of Materials for accuracy and timeliness; system security; material resource planning; the ability to produce immediate and efficient reports; track and control transfers of inventory across all locations; work orders; order entries; and a complete interactive capability.

No small task, indeed; nevertheless, "Tymshare has addressed these requirements and can provide a viable solution to each of them." Following some cost adjustments (as reflected in an August 8 letter from Tymshare to Napasco), the Proposal was signed on August 15, 1980.

## V.

There followed an ill-fated series of events. Three modules were to be installed first: inventory, accounts receivable, and order entry. Napasco and Tymshare began working together vigorously to prepare the Specification Documents for these three modules. A series of meetings took place in New Orleans, Houston, and Thibodeaux (where Napasco had another plant). After the first of these meetings, Napasco began building its data base. At some point in September or October, Tymshare provided Napasco with a "MANUFACTS Flow Chart," which indicated that the inventory module would be "up and running" in approximately three months, with the accounts receivable and order entry modules to follow one month later.

The meetings would often last for two or three days. Theoretically, the parties were hammering out solutions to the problems they confronted, providing answers to questions, honing the "flexible, customizable" MANUFACTS for installation-readiness. On October 20, 1980, the first target date for installation of the crucial inventory module was set—January 15, 1981—which comported nicely with the representation of three months in the flow chart.

## VI.

At trial, the testimony became very vague and inconclusive about this time period. Problems with the implementation of MANUFACTS were emerging, yet I cannot find clear responses—neither then nor at trial—that addressed these problems. For example, Don Champagne's notes from an early meeting with Tymshare people in Houston reflect that a new cost module, a method of valuing inventory, was being developed by Tymshare. A standard cost system, apparently to be contained in the inventory module, was crucial to Napasco in its efforts to avoid future overpurchasing. However, it does not appear that Napasco pressed this point with Tymshare, for example, as to when the cost system would be ready, how it would calculate costs, or how it would be utilized. Conversely, it does not appear that Tymshare attempted to make any of these details clear. The history of this transaction from mid-November, 1980 until mid-January, 1981 is a chronicle of ill-focused questions and incomplete or avoided answers.

One thing is clear: through November of 1980, Tymshare in no way indicated that the established target dates could not be met.

## VII.

In November, Tymshare gave Napasco three Specification Documents, none of which were the inventory module's, and Napasco refused to sign them. Tymshare delivered the Specification Document for the inventory module on December 15. Though rather desperate for the module due to pressure from Citicorp about Napasco's reporting requirements, Napasco did not sign this document either. In a strident letter to Chris Busch, a Tymshare supervisor, Don Champagne explained that the specification did not provide for interbranch transfers of data or for "general ledger and cost accounting interfaces." Instead, it turned out that the inventory module was to be used solely as a perpetual inventory control system, without satisfactorily "integrated" features. The letter added that,

> It is our opinion that you are using this approach as a method of buying time, and that you are unable to deliver the package (a totally integrated system) you sold us on the agreed upon date.

## VIII.

During this time, progress had been made toward the installation of the accounts receivable module. As always, however, Napasco's primary concern was the inventory module. After an intensive meeting on January 8, 1981 with Larry Suchor of Alexander Grant and John Dakin of Tymshare, Champagne sent a letter to Dakin that confirmed the needed program changes in the inventory module, and also highlighted some incorrect formulas in the module. By this time, the parties were apparently seeking installation of the module by late February or early March, 1981.

In response to Champagne's letter, Chris Busch informed Napasco that, in both parties' "best interest," installation of the order entry and inventory modules would be discontinued. Some of the reasons were as follows:

—Last night I was told by Product Development that the modifications regarding automatic standard cost journal entries, especially variance accounting, will not be completed until 4th quarter, 1981 . . .

—My management has instructed me to install standard software. . . As this project has progressed it has become apparent that the majority of changes required by NAPASCO are not merely cosmetic.

—A decision has been made to remove all statistical inventory control parameters. Our new system will be strictly a time-phased planning system using forecasted data rather than historical data as required by an order point system.

—We have been under the impression that Product Development would have the modifications for automatic inventory transfers for inter-divisional sales available by February of 1981. The fact is this feature will not be available any sooner than 4th quarter 1981.

—In order to install the system, my people must make many custom modifications that will not be supported by Product Development. This will cause a maintenance hardship heretofore for both companies.

. . . . .

—The logistics problems between Houston and New Orleans have proven to be a greater hardship than originally anticipated, given the current software problems.

Tymshare offered to continue installation of the accounts receivable module; however, Napasco elected not to proceed any further with Tymshare and so informed them on January 28, 1981.

## IX.

Shortly thereafter, Tymshare removed the MANUFACTS system from the marketplace. Though there was a great deal of conflicting testimony as to the precise date of this removal, i.e. whether early or late in 1981, the difference was largely semantic: no sales efforts were made after February of 1981, while all research and development stopped in late 1981.

Over the life of MANUFACTS, it seems that seventeen companies used or attempted to use the system. At the time of trial, only two companies were using MANUFACTS; each of these companies uses but one module.

## X.

No money was ever paid by Napasco to Tymshare for the MANUFACTS system.

## XI.

Napasco filed this lawsuit on June 8, 1981.

## CONCLUSIONS OF LAW

### I.

Counsel for Tymshare suggested at trial that the parties never entered into a contract, since the existence of the Proposal proves, at most, an agreement to agree and no meeting of the minds ever occurred. This suggestion, quite simply, is not supported by the evidence.

As both parties agreed, the Proposal itself is the best evidence of its terms and conditions. Perhaps "proposal" sounded less binding to Tymshare than "offer to contract"; however, upon consultation of Webster's Dictionary, one discovers that the two are synonymous: a "proposal" is "something proposed for consideration or acceptance; an offer, as of terms or conditions of agreement ..." Furthermore, the cover page of the Proposal refers to "the contents of this proposal, contract, and exhibits ..." And, finally, the ultimate page of the document is topped with the word "Acceptance." When this document was signed by both parties, they undoubtedly contracted for something.

Tymshare's second contention, however, is that the "something" was too indefinite—in the phraseology of Louisiana law, that the contract lacked a "certain object." La. Civ.Code Ann. art. 1779 (West 1952).[1] On the contrary, I have no trouble in finding a certain object in this case, for the Proposal fixed that object with admirable certainty. It described the MANUFACTS system. It explained what MANUFACTS would do for Napasco's problems, making clear that these problems had been recognized and then enumerating the "functional specifications" to solve those problems. It detailed the process of installation and defined what Tymshare's and Napasco's duties would be. Finally, the Proposal listed the modules to be installed and itemized the cost of each module, given a hypothetical amount of usage.[2]

The facts of the instant case are unlike *White Properties, Inc. v. LoCoco*, 377 So.2d 474 (La.App.1979). In *LoCoco*, the plaintiff sued the defendants for breach of contract to purchase a home to be built by the plaintiff. The defendants had agreed to purchase a "3500–4000 sq. ft. single family dwelling to be constructed as per plans to be attached to contract [with] approximate cost for improvement to be $90,000 to $95,000 range." Id. at 475. This agreement was supposed to reflect the defendants' "ideas and needs" that had been expressed at a meeting that day.

In finding a "certain object" to be lacking, the court stated that: "The problem was that the [defendants'] 'ideas and needs' were so vague and nebulous that they never could be captured." Id. at 476. The defendants had, in actuality, *no* house "in mind" when they signed the agreement to purchase; subsequent events had proven as much.

With Napasco (the analogous party to the defendant-purchaser in *LoCoco*) however, its "ideas and needs" were clearly set forth in the Proposal:

> The goal of the controller's office is to implement a cost-effective system that will track materials-flow, streamline the production process, and supply to the marketing and accounting departments an organized and timely flow of relevant data.

Throughout this transaction, the needs of Napasco, together with the "functional specifications" that needed to be addressed, remained constant. That Tymshare could not fill these needs is another matter. To be sure, things did not work out. Yet failures in the physical world are hardly persuasive proof that no "meeting of the minds" ever occurred, or else every time a party could not perform his contractual duties he would have a ready-made line of escape. Louisiana's requirement of a "certain object" cannot have been enacted to create such a "catch-22."

## II.

In reliance on the representations made by Tymshare in discussions with Napasco

---

**1.** Article 1779 lists four requisites "necessary to the validity of a contract:
  1. Parties legally capable of contracting.
  2. Their consent legally given.
  3. A certain object, which forms the matter of agreement.
  4. A lawful purpose."

The first, second, and fourth requisites are not disputed.

**2.** The August 8 letter changes none of the foregoing analysis; it simply reduced to writing various cost adjustments that were agreed to by Tymshare and Napasco.

and in the Proposal, Napasco entered into this transaction. Yet Tymshare would have me hold that, because of the many changes requested by Napasco in the "standard" MANUFACTS system, Napasco cannot now recover its damages. The problem with Tymshare's position, however, is that it would require a finding that Tymshare had *no* duty whatsoever to *respond* to Napasco's requested changes. Logic and fairness dictate otherwise.

■ In fact, Tymshare had a substantial duty to respond. After all, they were ostensibly the experts in this transaction; they knew how their computer system operated, what its capabilities were, and how long requested modifications would take. Or, at least, they should have known. Yet Tymshare's performance in this transaction suggests a company that was unwilling to come to grips with problems of its own; problems in its computer system, in its interbranch communications, and in the training of its applications personnel. While Napasco informed Tymshare of its problems, Tymshare chose not to return the favor.

The most convincing, illustrative evidence of these problems is the January 23, 1981 letter—the letter that breached the contract—from Chris Busch, Tymshare's branch manager in Houston, to Robert Donnes and Don Champagne. First, the letter makes it clear that Tymshare had not disclosed some rather essential elements of information about what MANUFACTS did and did not contain. For example, Busch informed Napasco "a decision" had been made to use only forecasted data rather than historical data in the "new system" (whatever that last phrase means). Yet, in the Proposal, MANUFACTS was going to address "the storage and comparison of historical accounting data." Either MANUFACTS never could or once could but now would not use historical data and, in any event, Napasco was never apprised of the situation.

Similarly, the Busch letter notified Napasco that "inventory transfers for inter-divisional sales" would not be available "any sooner than 4th quarter 1981." The Proposal had represented that MANUFACTS would address the tracking and controlling of "transfers of inventory across all locations," which, within the dates encompassed by the parties' dealings, it simply did not do. The same dichotomy between Tymshare's representation and actual fact existed with respect to a standard cost system.

A concomitant problem with Tymshare's operation can be analogized to the old saw about "the left hand doesn't know what the right hand is doing." In this case, the "left hand" was the MANUFACTS installation group in Houston; the "right hand" was the Products Development group in California. The oral testimony at trial suggested and the Busch letter confirmed that communication between these two branches was, to put it mildly, less than perfect. Apparently, the people in Houston—those involved with Napasco—were never aware of the precise capabilities of MANUFACTS; this lack of awareness engendered an all-too-frequent response by Tymshare representatives: the classic "We'll get back to you on that," or words to that effect.

By the preceding discussion, I do not mean to suggest that the eventual breakdown of this transaction was solely caused by Tymshare. Testimony at trial made clear that Napasco's accounting system was woefully inadequate, that its data compilation was handled somewhat roughly, and that it probably asked for a number of things from MANUFACTS which were either impossible, ridiculously expensive, or far too time-consuming. What I do mean to suggest is that Tymshare was surely not itself blameless and that insofar as Napasco's imperfections and imperceptions were concerned, Tymshare had a duty to alert Napasco to the areas in which Napasco or MANUFACTS was lacking. Not by saying, as Tymshare's representatives did, "I don't know; that may take some time," or "that will cost a bit more," or "you need to enter more data," but by focusing Napasco on precisely how long a modification would take, how much a modification would cost, and how certain modifications could not be

performed because the technology had not been developed in the MANUFACTS system.

Throughout the four-month period from October to January, Tymshare was content, inter alia, to allow the "three-month" representation about installation of the inventory module to remain undisturbed, to leave undefined the distinction between a minor "custom tailoring" and a "major modification." Having done so, and having allowed Napasco to rely on the promises in their contract and to proceed in the belief that the avowed expertise of Tymshare would keep things on a steady course, Tymshare cannot avoid its liability to Napasco for damages. "Sales-puffing"[3] and silence are not defenses, especially not for the party with more information about the proposed system.

### III.

■ Tymshare's breach of the contract with Napasco was an active violation, defined under Louisiana law to be "doing something inconsistent with the obligation it has proposed." La.Civ.Code Ann. art. 1931 (West 1977).[4] As stated earlier, the inventory module was in many ways the linchpin of this contract and the Busch letter of January 23, 1981 discontinuing installation of that module (as well as order entry) was, quite clearly, an active violation.

> Where a party refuses and does not merely fail or neglect to comply with his contractual obligation, his refusal constitutes an active breach of the contract which relieves the other party of the obligation of continuing to perform the contract . . . Moreover, a definitive refusal to perform obviates the necessity of a formal putting in default as a prerequisite to recovery by the obligee.

Andrews Dev. Corp. v. West Esplanade Corp., 347 So.2d 210, 212–3 (La.1977) (citations omitted).

### IV.

■ Though an active violation, the breach by Tymshare was not in bad faith. In actions for breach of contract, bad faith "is not . . . the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will." La.Civ.Code Ann. art. 1934 (West 1977). There was no evidence to suggest any kind of Machiavellian scheme on Tymshare's part at any time; rather, the evidence established that both parties worked diligently, if not effectively, toward implementation of the MANUFACTS system. Both parties sincerely hoped their efforts would succeed.

### V.

It remains for me to determine the correct measure of damages. Article 1934 of the Louisiana Civil Code provides that "the damages due to the creditor for [a contract's] breach are the amount of the loss he has sustained, and the profit of which he has been deprived . . ." Furthermore, in light of my finding that Tymshare did not act in bad faith, Tymshare "is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract." Id.

■ The plaintiff has the burden of proof to show the damages suffered by him as a result of the defendant's breach. An award of damages cannot be based on speculation or conjecture. On the other hand,

---

**3.** One contention by Tymshare about the flow charts was that they were merely "sales tools." Yet at least two defense witnesses admitted that buyers were expected to rely on the charts. If relied on in good faith by Napasco, as they were, the issue of whether the flow charts were "sales tools" or "potential working documents" seems largely irrelevant.

**4.** It is, therefore, unnecessary for me to determine whether this case presents a situation in which "the thing to be given or done by the contract was of such a nature, that it could only be given or done within a certain time, which has elapsed . . ." and, as such, involving an exception to the general prerequisite of putting the debtor in default when only a passive violation has occurred. La.Civ.Code Ann. art. 1933 (West 1977).

Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate . . .

*Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1926).[5]

## VI.

At trial, each party produced an expert on the question of damages. The plaintiff's expert suggested four elements of damage done to Napasco by Tymshare's breach:

1. Loss due to Tymshare's failure to provide a proper inventory control system;

2. Loss due to Tymshare's failure to provide cost control;

3. Loss due to a distress sale of Napasco necessitated by Tymshare's breach; and

4. Out-of-pocket and unreimbursed expenses.

I take these up in turn.

## VII.

■ Napasco's expert valued the cost of on-hand excess inventory as of September 1, 1982 (after deducting the portion financed by Citicorp) at $110,000. This calculation is indefensible: it did not state how much inventory was on hand as of July 1980; it assumed that all excess inventory was wholly unusable; and it contained no definition of excess inventory. Elements of damages need not be proven with "absolute exactness;" neither should a judge simply make up numbers. Tymshare's expert valued this loss at zero and I concur. See *Clements Auto Company v. Service Bureau Corporation,* 444 F.2d 169, 189–90 (8th Cir. 1971) (no recovery for "obsolete" inventory).

## VIII.

■ The second element of damages about which Napasco's expert testified related to recurring costs at Napasco that could have been saved by MANUFACTS. The number chosen was $50,000 per month which, somewhat dismayingly, materialized without any substantiated basis of proof.[6] I assume that some amount of money would have been saved by the installation of MANUFACTS; however, Napasco failed or was unable to specify its recurring costs, did not explain how and in what amount MANUFACTS would have reduced particular costs, and failed to account for the cost of operating MANUFACTS itself.[7] Again, I may not simply hypothecate a number.

---

5. This quotation has been cited with approval in two cases involving the installation of computer systems and the appropriate measure of damages. See *Clements Auto Company v. Service Bureau Corporation,* 444 F.2d 169, 190 (8th Cir.1971); *Chatlos Systems v. National Cash Register Corp.,* 479 F.Supp. 738, 747 (D.N.J. 1979). These cases have proven conceptually useful to me in arriving at the amount of Napasco's damages.

6. Gary Rinck, a certified public accountant, was hired by Napasco to implement a new accounting system after the MANUFACTS deal fell through. He too testified that MANUFACTS could have "easily recognized" $50,000 per month savings for Napasco; in fact, Napasco's economic expert appears to have based his calculations on Mr. Rinck's figures. However, Mr. Rinck has only been with Napasco since May, 1982—almost a year and a half after the relationship ended between Tymshare and Napasco. And, aside from his temporal remote-

ness, Mr. Rinck was in no way specific about the recurring costs.

Additionally, Mr. Rinck testified that "these cuts have been made now," suggesting that poor management, as much as the lack of a computer accounting system, was responsible for Napasco's unnecessarily high overhead.

7. This is not a situation in which "the trial judge is convinced that substantial pecuniary harm has been inflicted, even though its amount in dollars is *incapable of proof.*" 5 A. Corbin, Corbin on Contracts § 1020 (1964) (emphasis added). In such situations, trial judges have more discretion to fashion an appropriate award. Id.

Here, the recurring costs were hardly incapable of proof. At the very least, Napasco could have adumbrated individual areas of such costs, assigned dollar amounts, reduced the total amount by the cost of using MANUFACTS, and arrived at a reasonable figure. Cf. *Clements Auto Company v. Service Bureau Corporation,* 298 F.Supp. 115, 134 (D.Minn.1969)

## IX.

I must also disallow the third component of plaintiff's alleged damages, which concerned the sale of Napasco under "distress conditions." In the first place, the details of the sale were unclear: Napasco's expert reported that "NAPASCO will not survive the sale in its present position as a manufacturer. It will survive only as a distributor." The import of this statement is not at all apparent. Secondly, Tymshare's expert listed ten problems with the conceptual approach utilized by Napasco's expert; suffice it to say that plaintiff did not provide me with a "reasonable basis" for computation of damages.

Moreover, I do not believe the damages, if any, resulting from a distress sale were contemplated by the parties as that term is used in Louisiana law. In the Proposal, Napasco held itself out to be a "profitable, growing manufacturer and distributor." At the time the contract was made, Tymshare knew or could be expected to have known that Napasco's accounting department was being run inefficiently, that the amount of the loan to be received from Citicorp was linked to the submission of timely financial statements by Napasco, and that Napasco was relying on MANU-FACTS to help operations run more smoothly. However, it cannot be argued that Tymshare realized or should have foreseen that failure to implement the MANU-FACTS system would result in a distress sale, when no hint had been made of such allegedly dire straits. This is so particularly when the sale occurred (or is about to occur—plaintiff's testimony was in conflict on this point) at least twenty months after the business relationship between Tymshare and Napasco had been terminated.

## X.

Turning now to Napasco's out-of-pocket, unreimbursed expenses, I find, with two revisions, that these damages were proven with enough specificity to afford a "reasonable basis of computation." Unlike the alleged recurring costs, these expenses were broken down individually, were confined to an appropriate time period, and were testified to by employees (primarily Don Champagne) who had personal knowledge of the day-to-day life of the transaction. Furthermore, the defendant's expert could point to no *logical* errors in these figures; he simply felt they were not properly supported by documentation.

The time expenses for Napasco employees working with Tymshare are all reasonable, except the percentages of time assigned for Abe Moradian and Robert Donnes. Moradian was the president of Napasco during this period; his only involvement with Tymshare consisted of attending a few meetings and rubber-stamping decisions made by Champagne and Donnes. From the testimony developed at trial, I have concluded that Moradian spent about five per cent of his time on Tymshare; this reduces the recovery for his time to $3,662.00. Secondly, Robert Donnes testified that he spent ten, not fifty, per cent of his time working on Tymshare; his salary expense is thereby reduced to $1,800.00. Thus, the salary expenses for employees working with Tymshare equal $51,374.00.

The travel and entertainment expenses of Champagne and Donnes were documented, the miscellaneous amount of $200 was too small to quibble with. These expenses equal $2,092.04.

Napasco had to expend an additional $7,163.85 to revivify its contract with Alexander Grant for a perpetual inventory control system. There was testimony that numerous forms were printed in connection with the dealings with Tymshare; their cost was valued at $1,000 and uncontradicted by Tymshare witnesses. Next, Napasco had to pay $3,384 to ACA, a service bureau in Chicago, as a start-up fee for the han-

(plaintiff specified increased clerical and supply costs); *Chatlos Systems v. National Cash Register Corp., supra* note 5 at 747 (plaintiff offered exhibits and testimony to show labor costs that would have been saved by computer system's implementation). Instead, plaintiff offered nothing more than a single undocumented, undifferentiated, bulk figure; this offer did not satisfactorily discharge its burden of proof.

dling of accounts receivable. And, finally, the phone company: $156.75. The total for these expenses is $11,704.60.

## XI.

In conclusion, judgment will be entered for the plaintiff awarding compensatory damages in the amount of $65,170.64.